# BURCK v. TAYLOR.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

No. 170.   Argued December 15, 1893. — Decided April 9, 1894.

S. contracted with the State of Texas, in writing, January 18, 1882, to build a new capitol building for it for an agreed compensation, and not to assign the contract without the consent of the State. On the 31st of January, 1882, S., with the consent of the State, assigned an undivided three-fourths interest in the contract to F., G., and T., who were partners. On the same day, without the consent or knowledge of the State, S. assigned to B., C., and D., each one-fourth of the one-fourth interest remaining in him. On the 9th of May, 1882, S. conveyed to F., G., and T. all the right and interest which he had in and under the contract, and the State gave its assent to this transfer on the 10th of May. It did not appear that the assignees in the last conveyance knew of the transfer to B., C., and D. On the 20th of June, 1882, F. and G. transferred, with the consent of the State, all their interest in the contract to T., who then performed the work to the satisfaction of the State, and received the agreed compensation therefor. On the 1st of April, 1883, D. transferred to E. the interest in the contract which had been transferred to him, January 31, 1882, and on the 27th of May, 1884, he transferred the same interest to T. Most of these conveyances were filed and recorded in the office of the county clerk for Travis County, Texas, and some were filed in the office of the comptroller of public accounts of the State. In a suit brought by E. against T. to recover what he claimed to be his share of the profits under the contract, *Held*,

(1) That it was not competent for S., by his own act, and without the consent of the State, to transfer any interest in the contract;

(2) That all that could have been acquired by an assignment by S. without the consent of the State was a right to maintain an action against S. for the share of the profits which he had attempted to transfer;

(3) That when the contract was transferred to T., who was accepted by the State in lieu of the original contractor, T. entered upon its performance free from any disposition of the profits made by the original contract;

(4) That the filing of an instrument for record in a public office of the State, for the record of which the statutes of the State made no provision, carried with it no notice to other parties.

ON December 8, 1888, appellant filed his petition in the District Court of Travis County, Texas, to recover of defendant the sum of $231,417, alleged to be his share of the profits of the contract made with the State of Texas for the building of its capitol. The suit thus commenced was thereafter removed to the United States Circuit Court for the Western District of Texas, and on October 7, 1889, upon leave obtained, the plaintiff filed an amended bill. To this bill, on November 4, defendant demurred. On March 4, 1890, the demurrer was sustained, and the plaintiff electing to stand upon his bill and declining to amend it, a decree was entered dismissing the same with costs. From such decree of dismissal the plaintiff appealed to this court. The matters set forth in the bill are as follows: On January 18, 1882, the State of Texas, by Joseph Lee and N. L. Norton, capitol commissioners, with the approval of O. M. Roberts, governor, made and executed a contract with Matthias Schnell for the erection of the capitol building, according to certain plans and specifications; Schnell to furnish all the material and do all the work, and the State, as the consideration therefor, to convey 3,000,000 acres of land. The twenty-sixth clause of the contract is as follows:

"It is further agreed, covenanted, and stipulated by the party of the second part that this contract shall not be assigned, in whole or in part, by the party of the second part without the consent, in writing, of the party of the first part, signed by the governor of Texas and the capitol building commissioners, with the advice and consent of the heads of departments."

On January 31, 1882, Matthias Schnell, Charles B. Farwell, John V. Farwell, Amos C. Babcock, and the defendant, Abner Taylor, entered into a contract by which Schnell assigned and set over to the other parties an undivided three-fourths interest in said contract. The material portions of this contract are as follows:

"It is hereby agreed by and between the parties hereto that the said Matthias Schnell shall assign and set over, and by these presents does assign and set over, to the parties of the second part an undivided three-fourths ($\frac{3}{4}$) interest in said

contract for the purpose that the said parties of the second part may share in any and all the profits that may arise from same, the same as the party of the first part, as their interests may appear, which is hereby agreed to be equal.

"And it is understood and agreed by and between the parties hereto that the parties of the second part are to furnish whatever money may be needed or necessary for the proper construction of said state-house or for the execution of the said contract as the same may be required from time to time.

"It is further agreed and understood by and between the parties hereto that the said Matthias Schnell shall have the management and superintendence of the building and construction of said state-house from the commencement to its completion, subject to the direction and control of the majority in interest herein, at a salary of five thousand ($5000) dollars per annum, payable monthly.

*       *       *       *       *

"And it is further agreed that the said superintendent shall be personally responsible to the parties of the second part for any loss or damages caused or sustained by reason of his neglect or mistakes in prosecution of his duties as such superintendent, wilfully done.

"And it is hereby understood and agreed that this agreement shall be binding and operative from the date of its approval by the governor of Texas and the heads of departments."

In accordance with clause 26 of the original contract, the following consent to the assignment was endorsed on the back:

"STATE OF TEXAS, }
COUNTY OF TRAVIS. }.

"We hereby consent to the within assignment of an interest in the contract referred to this the eleventh day of February, 1882.

"(Signed)      JOSEPH LEE,
N. L. NORTON,
Capitol Building Commissioners.
O. M. ROBERTS, Governor.

"We advise and consent to the above consent given by the capitol building commissioners and governor this eleventh February, 1882.

"(Signed)　　F. R. LUBBOCK, *Treasurer.*

J. H. MCLEARY,

*Attorney General.*

W. C. WALSH,

*Commissioner General Land Office.*

W. M. BROWN, *Comptroller.*"

On January 31, 1882, Schnell made an agreement with James M. Beardsley, James S. Drake, and A. A. Burck, which, after referring to the prior contracts, purported to be an assignment and transfer to each of the three of an undivided one-fourth of the one-fourth interest in the contract remaining in Schnell. This contract, although signed and acknowledged by all four of the parties, was without the consent in writing of the State of Texas. Afterwards, and on May 9, 1892, Schnell executed in writing a further assignment in the following language:

"THE STATE OF TEXAS, ⎫
  COUNTY OF TRAVIS.  ⎭

"Know all men by these presents that I, Matthias Schnell, a citizen of Rock Island, in the State of Illinois, for and in consideration of the sum of fifteen thousand five hundred dollars to me now paid, the receipt whereof I do now acknowledge, have transferred, released, and conveyed to Charles B. Farwell, John V. Farwell, Abner Taylor, and Amos C. Babcock, who compose the firm of Taylor, Babcock & Co., all the rights and interest which I have in and under a certain contract made by me with Joseph Lee and N. L. Norton, capitol commissioners, for the construction of a new state-house for the State of Texas.

"And I do also, for the consideration hereinbefore expressed, transfer, assign, and release to said parties above named all interests, rights, or claims which I may now or might hereafter assert by virtue of any contract made by me with said

parties regarding the construction of said state-house or the superintendency thereof and all interest accruing to me from any contract regarding the building of said state-house for the State of Texas.

"In testimony whereof I have hereunto set my hand this the 9th day of May, A.D. 1882.

"(Signed) MATTHIAS SCHNELL;"

which assignment was duly acknowledged, the assignment accepted in writing, and a written consent endorsed upon it as follows:

"This certifies that we, the governor of Texas and the capitol building commissioners, with the advice and consent of the heads of departments, consent to the assignment in the foregoing instrument, made to take effect on the filing of the formal adoption of the contract referred to, and the execution and approval of the bond to carry out the same this tenth day of May, A.D. 1882. O. M. ROBERTS, *Governor.*

JOSEPH LEE,<br>N. L. NORTON,<br><em>Capitol Building Commissioners.</em><br>F. R. LUBBOCK, <em>Treasurer.</em><br>W. M. BROWN, <em>Comptroller.</em><br>W. C. WALSH,<br><em>Com'r Gen'l Land Office.</em><br>J. H. McLEARY,<br><em>Attorney General.</em>"

On June 20, 1882, the firm of Taylor, Babcock & Co. assigned and transferred the entire contract to Abner Taylor, the language of the transfer being as follows:

" . . . do hereby transfer and assign, and have transferred and assigned, to Abner Taylor, the said contract to construct, build, erect, complete, and deliver to the State of Texas a capitol building and appurtenances thereto according to the plans and specifications therein referred to and made a part thereof, and each and every, all and singular, the rights, profits, and benefits thereunder, the same to be by him carried

out in the same manner as provided for in the original contract between the State of Texas and Matthias Schnell as aforesaid ; "

which assignment was accepted in writing by Abner Taylor, whose acceptance contained this covenant on his part :

"Now, therefore, in consideration of the fact that, by virtue of the transfers and assignments herein set out, I, the said Abner Taylor, have become the contractor with the State of Texas for the building of the capitol aforesaid, and in consideration of the fact that the capitol building commissioners, together with the governor of Texas and the several heads of departments, have consented to the several transfers and assignments aforesaid, and in further consideration of the stipulations, covenants, and agreements set forth in the original contract between the State of Texas and Matthias Schnell, to the profits, rights, and benefits of which I have succeeded by virtue of the said contract and the several transfers and assignments aforesaid, I, the said Abner Taylor, have agreed, covenanted, and bound myself, and do by these presents agree, covenant, and bind myself, unto the State of Texas, through its capitol building commissioners, that I will in every particular carry out, finish, and perform the contract made and entered into by and between the State of Texas and Matthias Schnell, a printed copy of which is hereto attached as aforesaid, in the same manner, style, and method and according to the said terms, tenor, and effect that the said Matthias Schnell was originally bound to do, and I hereby adopt the said contract as my own, and assume each and every, all and singular, the obligations therein imposed on the party of the second part as my own as fully and completely as if they had originally been assumed, incurred, and undertaken by me in person, the said contract, of which the printed copy is hereto attached, being hereby incorporated into this contract and made a part thereof.

"And I, the said Abner Taylor, do hereby bind myself, my heirs, executors, and administrators, to keep and perform this covenant, agreement, and contract according to its full intent

and meaning in each and every, all and singular, of its parts and stipulations, in every particular whatsoever.

"In testimony whereof I hereto set my signature this the twentieth day of June, A.D. 1882, (one thousand eight hundred and eighty-two.)

"[SEAL.]    (Signed)  ABNER TAYLOR;"

and this assignment and acceptance, both being duly acknowledged, were also assented to in writing, endorsed on the back, the consent being in these words:

"STATE OF TEXAS, ⎱
 COUNTY OF TRAVIS. ⎰

"In accordance with the provisions of section 26 of the original contract between the State of Texas and Matthias Schnell for building a new capitol, dated eighteenth of January, 1882, we, O. M. Roberts, governor of Texas, and Joseph Lee and N. L. Norton, capitol building commissioners, acting by and with the advice and consent of the heads of departments, do hereby consent in writing to the assignment made by Matthias Schnell of his contract to Taylor, Babcock & Co., and to the further assignment made by Taylor, Babcock & Co. of the said contract to Abner Taylor; and we, the said governor, capitol building commissioners, and heads of departments do hereby recognize Abner Taylor as the contractor, bound in all respects to carry out the contract with the State of Texas in like manner as the original contractor, Matthias Schnell, was bound; and in testimony of our advice and consent having been so given we hereunto subscribe our names officially this the twelfth day of July, 1882.

'(Signed)  JOSEPH LEE.
       N. L. NORTON.

"Approved by and with the advice and consent of the heads of the departments.

"(Signed)  O. M. ROBERTS, *Governor.*"

On April 14, 1883, A. A. Burck executed to plaintiff the following conveyance:

"THE STATE OF TEXAS,  
COUNTY OF TRAVIS.

"Know all men by these presents that I, A. A. Burck, of the county of Milam and State of Texas, in consideration of the sum of ten thousand dollars to me in hand, paid by S. B. Burck, of the county of Galveston and State of Texas, the receipt of which is hereby acknowledged, have granted, bargained, sold, conveyed, and released, and by these presents do grant, bargain, sell, convey, and release, unto the said S. B. Burck, heirs and assigns, the following-described property, to wit: One undivided one-half interest in one-sixteenth interest in the capitol contract which was awarded to M. Schnell by the Texas state capitol commissioners, Joseph Lee and N. L. Norton, and transferred to me by said Schnell, together with all and singular the rights, members, improvements, hereditaments, and appurtenances to the same belonging or in anywise incident or appertaining:

"To have and to hold all and singular the premises above mentioned unto the said S. B. Burck, heirs and assigns forever; and I do hereby bind myself, heirs, executors, and administrators, to warrant and forever defend all and singular the said premises unto the said S. B. Burck, heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

"Witness my hand, at Austin, this 14th day of April, A.D. 1883.

"A. A. BURCK. [SEAL.]; "

Which conveyance was duly acknowledged. On May 27, 1884, A. A. Burck made an assignment to Taylor and Babcock in these words:

"AUSTIN, TEXAS, *May* 27, 1884.

"For and in consideration of one dollar, in hand paid, and other valuable considerations I hereby sell, assign, and transfer to Abner Taylor, of the county of Cook, State of Illinois, and A. C. Babcock, of the county of Fulton, said State, all my rights, interest, and claim in and to the contract or contracts from the State of Texas to build or erect a state-house or

capitol building in the city of Austin and last-mentioned State derived from a contract or agreement made with Matthias Schnell in Chicago, Cook County, Illinois, bearing date January 31st, 1882, or any interest I may have for building or erecting a state-house or capitol building in the city of Austin, Texas, derived from said Schnell at any time or from any other source, hereby relinquishing to said Taylor and Babcock all right or claim of any character to any and all contracts or agreements that I may have heretofore had or now possess pertaining to building, erecting, or constructing a state-house or capitol building in the city of Austin, State of Texas.

"Witness my hand and seal this 27th day of May, A.D. 1884.

"A. A. BURCK. [SEAL.];"

which was also duly acknowledged.

It further appears that the instrument dated January 31, by which Schnell transferred a three-fourths interest in the contract to the two Farwells, Babcock, and Taylor, was filed for registration on February 13, in the office of the clerk of the county court of the county of Travis, that being the county in which the capitol building was situated, and thereafter recorded in the records of said county; that the instrument executed between Schnell, Drake, Beardsley, and Burck was also filed and recorded in the same office on February 14, 1882; likewise the assignment of May 9, 1882, from Schnell to Taylor, Babcock & Co. on May 10, 1882, and the deed from A. A. Burck to S. B. Burck, of date April 14, 1883, on April 20, 1883; also the conveyance from Burck to Taylor and Babcock, of date May 27, 1884, on May 27, 1884. It also appears from the certificate of the comptroller of public accounts of the State of Texas that the original contract of the State with Schnell, together with the assignment from Schnell to the two Farwells, Babcock, and Taylor, of date January 31, the assignment, of date May 9, from Schnell to Taylor, Babcock & Co., and the assignment from Taylor, Babcock & Co. to Abner Taylor, were all on file in his office, though when so filed is not stated. With reference to the

effect of the filing in the office of the clerk of Travis County, the bill avers as follows:

"And your orator further says that the account between your orator and defendant as to this matter is still open and unsettled, and that for reason why your orator should not have an account or relief against him the defendant pretends that he had no notice that the said A. A. Burck assigned or transferred to your orator a one-half interest in his, the said A. A. Burck's, one-sixteenth interest in the profits that might arise from the building of said capitol contract, and that the defendant in good faith and without notice purchased from said A. A. Burck for a valuable consideration the said Burck's one-sixteenth interest in said profits after the said A. A. Burck had sold one-half of his said interest to your orator, and therefore refuses to account with plaintiff; whereas the truth is that the said transfer by A. A. Burck to your orator, which has been hereinbefore stated and made a part of this bill as an exhibit, was duly authenticated for registration in the office of the county clerk, and was duly recorded in the records of deeds of Travis County, Texas, on the 14th day of April, A.D. 1883, and said Abner Taylor then had notice of the same; whereas the said A. A. Burck did not sell or transfer any of his said interest in said profits to said Abner Taylor until the 27th day of May, 1884.

"That the said Abner Taylor ought not to be heard to aver that said registration was not notice to him of the said assignment by A. A. Burck to your orator, for that the formation of the copartnership between Matthias Schnell, Abner Taylor, Amos C. Babcock, Charles B. Farwell, and John V. Farwell, as hereinbefore alleged, wherein it was stipulated that the profits arising from building the capitol should be divided between said parties or with the assignees of either party, the said copartnership caused said contract of copartnership, which contained an assignment by said Schnell of three-fourths of his interest in said capitol contract, to be recorded in the register of deeds of Travis County, whereupon the said A. A. Burck, J. M. Beardsley, and James S. Drake, acting on this means of giving notice of assignments adopted by said part-

nership, caused their said assignment to be recorded in the office of the clerk of the county court of Travis County in the records of deeds; and afterwards, when the said Schnell assigned his remaining interest in said contract and in the profits that might arise from the fulfilment of the same to the other members of said firm styled Taylor, Babcock & Co., the said firm caused said last-mentioned assignment to be also recorded in the said register of deeds as a means of giving notice thereof; that when the said firm of Taylor, Babcock & Co. and the individual members thereof assigned their interests in said contract to Abner Taylor, the defendant herein, they and said Taylor in their contract of assignment referred to the several mesne assignments of interests in said contract as being of record in the office of the clerk of the county court of Travis County, and referred to said records for full particulars as to said mesne assignments, whereby the said parties concerned in said contract for building said capitol building agreed and established a custom among themselves to give notice of assignments of interests in said capitol contract or in the profits that might arise from the fulfilment of the same by recording such assignments in the records of deeds of Travis County, Texas, and by their conduct in so recording such assignments, and referring to said records and not otherwise giving notice of such assignments led your orator to believe and justified him in believing that said partnership and its assigns would take notice of the assignment by said A. A. Burck to your orator when your orator placed the same on record in the records of deeds of Travis County, duly authenticated for record; that your orator, fully believing that such record would be accepted as notice of the said assignment to your orator, caused his said assignment to be promptly recorded in the records of deeds of Travis County on the 14th day of April, 1883, which was more than a year before the said Abner Taylor purchased any interest from the said A. A. Burck."

And with regard to the rights acquired by defendant, through the conveyance of May 27, 1884, from A. A. Burck to him, it avers as follows:

" And your orator further says that said assignment by A. A. Burck to Abner Taylor did not purport on its face to sell or assign to said Taylor the interests in the profits of said capitol contract which the said A. A. Burck had assigned to your orator, but only purported to assign to said Taylor whatever interest the said A. A. Burck had at the time of the said assignment to Abner Taylor, or might thereafter have; wherefore the said Abner Taylor, defendant, was placed upon notice and inquiry as to whether A. A. Burck had parted with any of his interest before the assignment of his remaining interest to the said Abner Taylor, but the said Abner Taylor made no inquiry of said A. A. Burck as to whether he had parted with any of his, the said Burck's interest, nor did the said Taylor examine or cause to be examined the records of deeds of Travis County for any record of an assignment by said A. A. Burck, notwithstanding the said custom and practice of all the parties concerned in assignments affecting said capitol contract or interest in the profits thereof to record all such assignments and the agreement thereby affected to that [as their?] method of giving notice of assignments."

The bill further alleges the performance of the contract by Taylor, large profits as the result thereof, and prays an accounting.

*Mr. F. Charles Hume,* (with whom was *Mr. F. G. Morris* on the brief,) for appellant.

*Mr. George E. Hamilton* for appellee.

MR. JUSTICE BREWER delivered the opinion of the court.

That which arrests the attention is that, though the defendant furnished all the means and did all the work of building the capitol, and although the authorities of the State expressly recognized him as the contractor, bound in all respects to carry out the contract with the State in the same manner as the original contractor, and though he had no knowledge of any claim of plaintiff, the court is asked to recognize the latter as the owner of one thirty-second of the profits of the con-

tract, and to compel the defendant to pay him that amount. While only one thirty-second of the profits is asked for, the rule would be the same if thirty one thirty-seconds were sued for, and the first and principal question which arises is, whether these transactions between Schnell and A. A. Burck and between A. A. Burck and plaintiff, had without the knowledge of the defendant, operated to create in the plaintiff a valid claim to a share of the profits. The contract in its twenty-sixth clause stipulated that there should be no assignment in whole or in part by the contractor without the consent in writing of the state authorities. No such consent was given to the assignment by Schnell to Burck, nor does it appear that the State ever in any form recognized the plaintiff, or his immediate grantor, as having any interest in, or control of, the contract, or any part thereof. He was to both the State and the defendant, who did the work, an unknown party until after the full completion of the contract, when for the first time he appears claiming an interest in the profits by virtue of an assignment and transfer, made before the work was done and in disregard of the terms of the contract.

It is earnestly insisted by counsel that this provision forbidding an assignment without the written consent of the state authorities was solely for the benefit and protection of the State; that it did not restrict or interfere with the right of the contractor to dispose, in any way he saw fit, of an interest in the contract, or the profits thereof, so long as the party to whom such transfer was made attempted no interference with the actual work, and presented no claim against the State. The contract in the possession of the contractor was his property, and the profits arising therefrom, and any interest therein, were as much the subject of disposal as any other property, and the only limitation was one for the benefit of the State and could not be claimed by any subsequent assignee from the contractor. The case of *Hobbs* v. *McLean*, 117 U. S. 567, 576, is relied upon as authority for this contention. In that case one Peck having, in response to an advertisement from the proper authorities, put in a bid for furnishing wood and hay to the government, and expecting that the contract

would be awarded to him, entered into a partnership with McLean and Harmon, by which Peck was to furnish one-half of the capital necessary to carry on the partnership business, and McLean and Harmon each one-fourth, the profits and losses of the partnership to be divided in like proportion. The partnership was for the purpose of carrying out this expected contract. Subsequently, the contract with the government was obtained, and after it had been performed and the money therefor paid to an assignee in bankruptcy of Peck, the other partners, McLean and Harmon, filed their bill to recover their proportionate share of the profits, as fixed by the terms of this partnership. Among the defences was that the partnership was invalid by reason of section 3737, Revised Statutes, which reads as follows:

"No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States."

But this defence was overruled, the court, by Mr. Justice Woods, observing in respect thereto:

"Interpreting the articles in the light of the statute, as it is the duty of the court to do, they were not intended to transfer, and do not transfer, to the plaintiffs any claim or demand, legal or equitable, against the United States, or any right to exact payment from the government by suit or otherwise. They may be fairly construed to be the personal contract of Peck, by which, in consideration of money to be advanced and services to be performed by the plaintiffs, he agreed to divide with them a fund which he expected to receive from the United States, on a contract which he had not yet entered into. This is the plainly expressed meaning of the partnership contract, and it is only by a strained and forced construction that it can be held to effect a transfer of Peck's contract with the United States, and to be a violation of the statute.

" We are of opinion that the partnership contract was not opposed to the policy of the statute. The sections under consideration were passed for the protection of the government. *Goodman* v. *Niblack*, 102 U. S. 556. They were passed in order that the government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing until the contract was completed and a settlement made. Their purpose was not to dictate to the contractor what he should do with the money received on his contract after the contract had been performed."

It is insisted that, tested by the rule thus laid down, this stipulation of clause 26 was one solely for the benefit of the State, and worked no restriction on the right of the contractor to dispose, in advance of the completion of the contract, of the profits which should enure therefrom.

We cannot concur in these views. By the section quoted not only was a transfer of the contract prohibited, but also the result of such a forbidden transfer declared. In terms it was said that any " such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned." *Expressio unius est exclusio alterius.* The express declaration that so far as the United States are concerned a transfer shall work an annulment of the contract, carries, by clear implication, the declaration that it shall have no such effect as between the contractor and his transferee. In other words, as to them, the transfer is like any other transfer of property, and controlled by the same rules. Its invalidity is only so far as the government is concerned, and it alone can raise any question of the violation of the statute. The government in effect, by this section, said to every contractor, You may deal with your contract as you please, and as you may deal with any other property belonging to you, but so far as we are concerned you, and you only, will be recognized either in the execution of the contract or in the payment of the consideration.

It is familiar law that not every contract in contravention of the terms of a statute is void, and the courts will search

the language of the statute to see whether it was the intent of the makers. that a contract in contravention of it should be void or not. *Harris* v. *Runnels*, 12 How. 79; *Miller* v. *Ammon*, 145 U. S. 421; *Pangborn* v. *Westlake*, 36 Iowa, 546.

It was in pursuance of this line of thought that the court, in *Hobbs* v. *McLean*, ruled as it did as to the effect of a transfer by a contractor with the United States of an interest in his contract to a third party. But it has never been doubted that, as a general rule, a contract made in contravention of a statute is void and cannot be enforced, and the only exception arises when, from an examination of the statute, the courts are able to discern a different or a limited purpose on the part of the law makers.

It is true that, in the case at bar, we have no construction of a statute, but only of the terms of a contract. That contract, however, was as binding on the one party as the other. The contractor assented to its terms precisely as did the State, and his promise was not to assign the contract in whole or in part without the consent in writing of the state authorities. It was a promise which entered into and became one of the terms of the contract, and one which was binding, not only upon the parties, but upon all others who sought to acquire rights in it. It may be conceded that, primarily, it was a provision intended, although not expressed, for the benefit of the State, and to protect it from interference by other parties in the performance of the contract, to secure the constant and sole service of a contractor with whom the State was willing to deal, and to relieve itself from the annoyance of claims springing up during or after the completion of the contract in favor of parties of whose interests in the contract it had no previous knowledge, and to the acquisition of whose interests it had not consented. Concede all this, and yet it remains true that it was a stipulation which was one of the terms of the contract and binding upon the contractor, and equally binding upon all who dealt with him. It is unnecessary to hold that the contractor might not be personally bound upon his promise made before the performance of the contract to

transfer a portion of his profits to any third party. Whatever liabilities he might assume by such a promise, it would be an independent promise on his part, and would not let the promisee into an interest in the contract. It would give him no right to take part in the work, no right to receive anything from the State, and all that it would give him would be an independent right of action against the contractor for the failure to pay that which he had promised to pay; the contract remaining all the time the property of the contractor, subject to disposal by and with the consent of the State. To him alone the State would remain under obligations, and with him alone would the State be required to deal. In no way, by garnishment, injunction, or otherwise, could the promisee prevent the State from carrying out the entire contract with the contractor, paying to him the whole consideration, and receiving from him a full release. By the three instruments of January 31, May 9, and June 20, 1882, this contract was wholly transferred to and accepted by the defendant. This was while the contract was executory and before the work was done, and these transfers were with the written consent and approval of the state authorities, and by them the State in terms recognized "Abner Taylor as the contractor, bound in all respects to carry out the contract with the State of Texas in like manner as the original contractor, Matthias Schnell, was bound." In other words, by the consent of parties, and in accordance with the express provisions of the contract, before the work was done Abner Taylor, the defendant, was substituted for Schnell as the contractor. It was precisely the same as though the contract with Schnell had been surrendered and a new one made with Taylor. The contract was still executory; nothing had been earned by Schnell, and nothing was due to him. He steps out of the contract and Taylor steps in; Taylor is accepted as the contractor and proceeds with the work. Would it not be strange if, after having thus completed the contract, some person could, on the strength of an unknown transfer of the entire profits of the contract made before the transfer to Taylor, compel the latter to pay to him such entire profits? And yet if one thirty-

second of the entire profits can be so obtained, all the profits could, in like manner, have been obtained.

It will be borne in mind that the instrument of date January 31, 1882, by which Schnell transferred to Taylor, Babcock & Co. a three-fourths interest in the contract, did not operate to make Schnell a mere beneficiary of profits. He and they became thereby joint contractors with the State. He was under the same obligation of performance as they, and for any failure in respect thereto the State could hold him responsible equally with them. The mere fact that there was a division between themselves as to duties in no manner abridged the fact that he was a joint contractor with them. They, it is true, were to furnish the money, but he was to have the management and superintendence. He was to take his part in the performance of the contract. Not only that, but, as seen, he was to be personally responsible to them for any loss or damage caused or sustained by reason of his neglect or mistakes. So, that if he had gone on jointly with them in the performance of the contract as provided for, out of the profits earned in the performance of the contract, they would have had a right to deduct from the amount coming to him all the loss and damages which they had sustained by reason of his neglect and mistakes.

We have thus far rested the non-assignability of this contract, or any interest therein, to plaintiff's grantor upon the express stipulation of clause 26; but even in the absence of such a clause, it was not competent for Schnell, by his own act, and without the consent of the State, the other contracting party, to transfer any interest in this contract. It is a contract of that nature which is not susceptible of assignment without the consent of the other party. *Arkansas Valley Smelting Co.* v. *Belden Mining Co.*, 127 U. S. 379; *Delaware County* v. *Diebold Safe & Lock Co.*, 133 U. S. 473, 488. In the latter case it was said by this court:

" A contract to pay money may doubtless be assigned by the person to whom the money is payable, if there is nothing in the terms of the contract which manifests the intention of the parties to it that it shall not be assignable. But when

rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract."

So that even if clause 26 had been omitted from the contract, Schnell, the contractor, could never have transferred an interest in it to the grantor of plaintiff so as to vest in him a right to take part in the work, or a subsequent right to recover from the State on the completion of the work. All that could ever have been acquired by an assignment or transfer by Schnell, without the consent of the State, was a right to maintain an independent action against him for whatever share of the profits he had attempted to transfer. But that obligation would be personal to Schnell, and was not assumed by the defendant, or Taylor, Babcock & Co. when they took an assignment of the entire contract from Schnell. Assuming to the State the performance of Schnell's contract carried with it no assumption of Schnell's unauthorized assignments or of his promises to pay over certain portions of the profits he would have received had he performed the contract. In other words, stepping into the place of Schnell in this contract with the State, they did not assume his personal liabilities to third parties. They assumed his obligations to the State, and they took with those obligations a right to receive the entire consideration promised by the State, and they did not agree to become liable for all or any independent promises he had made in reference to the contract.

It is true that in that assignment it was stipulated that the profits were "to be divided as the interests of the parties appear under the contract, or to their heirs or assigns." If Schnell, with Taylor, Babcock & Co., had under that assignment performed the contract with the State and had made profits thereby, it may be that this plaintiff after giving notice could have enforced both against Schnell and this defendant a one-thirty-second of such profits, resting upon this stipulation.

for division among the parties or their assigns, but as Schnell never earned any share in the profits there is nothing upon which that stipulation can take effect. The profits which would have resulted if Schnell, with Taylor, Babcock & Co., had performed the contract might have been very different from that which did result from the performance of the contract by Taylor alone. It is a mistake to suppose that the profits to be derived from the performance of a contract, as yet unexecuted, are something separable from the performance — as a coupon is detachable from a bond — and can be sent floating through the channels of commerce as a separate obligation. The profits are tied up in the contract to such an extent that the promise in respect to them becomes of value only when he who makes the promise shall have earned the profits through the performance of the contract. And when the contract, being wholly executory, is transferred to a third party who is accepted by the promisor in lieu of the original contractor, such third party enters upon the performance of the contract free from any disposition of the profits made by the original contract or before the substitution.

We have thus far considered this case on the assumption that the defendant proceeded with the completion of his contract in ignorance of any transfer to plaintiff, and that such was the case is, we think, a fair inference from the allegations of the bill. The pleader has evidently sought to charge constructive notice from the fact of record in the office of the clerk of the county in which the work was done, but in which none of the land promised and deeded was situated. It is not pretended that there was any statute providing for such record, or making the record notice to subsequent assignees or purchasers, Rev. Stat. Texas, 1879, art. 4331; *Burnham* v. *Chandler*, 15 Texas, 441; *Wright* v. *Lancaster*, 48 Texas, 250; but it is alleged that the assignments and transfers under which the defendant claims were recorded in that office. The argument seems to be that the defendant and his assignors selected filing and record in that office as a means of giving notice to other parties of their rights, and that having made such selection was equivalent to an admission

that they would accept a like filing and record as notice to them; but that argument cannot be sustained. The defendant and his assignors may have desired to give as much publicity as possible to the fact of the transfers to themselves, and in seeking to give such publicity may have selected the filing and record in one of the principal offices of the county as a means thereto, but they did not thereby create a new law in respect to notice. They never in terms declared, and their own acts of filing for record carried, no implied declaration of their willingness to accept a similar record as notice to themselves. They had a right to rely upon the law of the State, as enacted by its legislature, and were not bound by any constructive notice other than those laws provided. If notice was essential to charge them, actual notice should have been given, at least in the absence of a statute providing some means for constructive notice. Indeed, it is a mere and not very reasonable inference from the fact that they placed these instruments on record that their purpose was thereby to give notice. As well might it be assumed that they simply sought to have preserved for their own use a recorded copy of their assignments rather than rest upon their own possession of the original papers. It is true in this part of the bill there is a statement that "said Abner Taylor then had notice of the same." This language standing by itself is open to a construction that actual notice was charged, but that no such construction should be given to it is evident from the paragraph immediately following, in which the pleader alleges that notice was given by filing and record, and states the reasons why such filing and record should be accepted as constructive notice. Indeed, we do not understand from counsel's brief or argument that there is a claim that there was actual notice given of these transfers.

Finally, it is claimed that the defendant was chargeable with notice because the assignment which he took from A. A. Burck, on May 27, 1884, was really nothing but a quitclaim; that a party taking under a quitclaim deed cannot be a *bona fide* purchaser, but takes with notice of all limitations of his grantor's rights, and in respect thereto several authorities are

cited from the State of Texas and elsewhere as to the rights of one taking under such a deed.

We do not care to enter into the consideration of this question; for, while the instrument is open to two constructions, yet, conceding that it in terms only quitclaimed, it took nothing away from Taylor's rights; it was not executed until two years and over after Schnell had parted with all his interest in the contract to Taylor, Babcock & Co., and it could not possibly have the retroactive effect of vesting in the plaintiff a right as against Taylor, which he did not theretofore have. All that can be inferred from that instrument is that more than two years after Schnell had parted with his entire interest in the contract to defendant and his associates, and they had assumed full responsibility to the State, and nearly two years after defendant had accepted the sole responsibility of the contract, and after he had partially performed its obligations, he ascertained in some way the existence of an outstanding claim in favor of A. A. Burck and, rather than litigate with him the validity of that claim, purchased it. It was not an admission that A. A. Burck had a valid claim to the extent of the attempted assignment from Schnell to him, and the fact that it was in the mere language of a quit claim as likely resulted from the unwillingness of A. A. Burck to assume the obligations of a covenant or warranty as from any other reason.

In conclusion, we hold that by the nature of the contract as well as its express stipulation Schnell was incapacitated from transferring an interest therein without the consent of the State; that the attempted transfers from him to A. A. Burck and from A. A. Burck to S. B. Burck created simply a personal obligation which could be enforced against him alone; that the assignments and transfers with the consent of the State vested the absolute and sole interest in the contract in the defendant, Abner Taylor; that the latter took without notice of the plaintiff's claim; and that by his performance of the contract he acquired the right to the entire consideration promised by the State, and assumed no liability to Schnell, and no obligation to perform any promise which Schnell made

to plaintiff, or plaintiff's assignor.   The judgment of the Circuit Court is

*Affirmed.*

Mr. ·Justice Jackson, with whom concurred Mr. Justice Shiras, dissenting.

I am unable to concur in the opinion and judgment of the court in this case, and will briefly state the grounds of my dissent.

The case stands upon the bill, original and amended, and demurrer thereto.   From the nature of the building contract between the State of Texas and Schnell, as well as the covenant contained in the twenty-sixth clause thereof, providing that the contract should not be assigned in whole or in part by the contractor without the consent, in writing, of the designated state officials, " with the advice and consent of the heads of departments," the conclusion is reached by the court that " Schnell was incapacitated from transferring an interest therein without the consent of the State; that the admitted transfers from him to A. A. Burck, and from A. A. Burck to S. B. Burck, (complainant,) created simply a personal obligation, which could be enforced against him alone; that the assignments and transfers, with the consent of the State, vested the absolute and sole interest in the contract in the defendant, Abner Taylor; that the latter took without notice of the plaintiff's claim; that by his performance of the contract he acquired the right to the entire consideration promised by the State, and assumed no liability to Schnell and no obligation to perform any promise which Schnell made to plaintiff or plaintiff's assignor."

I find nothing in the allegations of the bill or in the exhibits, made a part thereof, which sustains the statement that Taylor " took without notice of the plaintiff's claim."   The bill certainly does not admit that Taylor took the transfer to himself and Babcock from A. A. Burck without notice of the previous transfer to S. B. Burck.   The other conclusions involve legal and equitable propositions, which, as applied to

the admitted facts of this case, are not, in my opinion, correct.

There are important allegations in the bill, and provisions in some of the contracts, made exhibits thereto and parts thereof, which are admitted by the demurrer, but which are not noticed or considered in the opinion. By the contract of January 31, 1882, (Exhibit " L,") Schnell assigned and set over to Charles B. Farwell, John V. Farwell, Amos C. Babcock, and Abner Taylor, " an undivided three-fourths interest in said (state) contract, for the purpose that the said parties of the second part may share in any and all the profits that may arise from same, the same as the party of the first part, (Schnell,) as their interests may appear, which is hereby agreed to be equal; " that is, the assignees collectively were interested in the three-fourths interest transferred to them. This contract further provided that the assignees were " to furnish whatever money may be needed or necessary for the proper construction of said state-house or for the execution of the said contract as the same may be required from time to time." The sum of $13,000, which the parties acknowledged to be then due Schnell, was to be paid with interest " whenever the sum of $50,000 shall have been realized by the sale of lands named in said (state) contract." After the payment of that sum the contract provides " that the said parties of the second part are to have all the remaining profits until all the money advanced as above stipulated shall be paid, with six per cent interest thereon per annum from the time said money is advanced, and all the other profits are to be divided as the interests of the parties appear under the contract or to their heirs or assigns. It is further agreed by and between the parties hereto that Amos C. Babcock, one of the parties of the second part, shall be the trustee for the parties herein named of each part, to act as and be the trustee to receive the title to be conveyed in pursuance of the contract between the State of Texas and the said Matthias Schnell and receipt for same to the proper officers of said State, and do all other things required of the said Schnell pertaining to the conveyance of the lands under said contract with the State of Texas or

capitol building commissioners, and to hold the same and to make such conveyances or sales of said lands or any portion thereof from time to time as the parties hereto may direct."

The State of Texas, by its proper officials, gave its written consent to this contract of assignment, which operated to substitute Schnell and his assignees, composing a partnership under the style of Taylor, Babcock & Company, as the contractors with the State in place of the original contractor. In thus becoming the substituted contractors with the State, instead of Schnell, the members of the partnership in no way abrogated or terminated the provisions of their private contract *inter sese* as above set forth. It admits of no question that by the terms of this partnership contract Schnell was not required to make any advances or incur any expenditures in executing the state contract and completing the capitol building, as the four assignees of an undivided three-fourths interest in the state contract were to advance all the funds required for that purpose, and obtain their reimbursement from the sales of the lands to be received from the State in settlement for the work. It is equally clear that Schnell retained a one-fourth share of the profits that might be realized on the contract after refunding advances made by his copartners in completing the capitol building. Now, the State of Texas certainly had no concern with these private matters and agreements between the new contractors. It was not interested in, or in any way affected by, the relative or respective shares of the contractors in the profits which might be made. Neither had the State any interest in the question as to how, or amongst whom, such profits, if any, should be divided. These were matters to be settled among the copartners or associate contractors, and they were settled by them in the provision of their private contract which provided that, after repaying the amount expended in constructing the state capitol, "all the other profits are to be divided as the interests of the parties appear under the contract, or to their heirs or assigns." It can hardly be doubted that this language permitted and provided for the assignment by either or all of the partners of his or their share in the profits, and that such

assignee could equitably assert a right thereto against any person into whose hands such profits might come, or be found, except a *bona fide* purchaser thereof for value without notice of the assignee's rights. Such an assignee of a share in the profits of the enterprise would have nothing to do with the execution of the state contract out of which profits might arise. Nor would he touch the State at any point, or in any way affect its rights, interest, or convenience. The contractor's covenant not to assign the building contract without the consent, in writing, of designated state officials, did not extend to or cover an assignment by the contractor of a share or interest in the profits which it was expected would arise from the execution of the contract. The State had notice of the provisions of the private partnership contract which included "assigns" among those entitled to share in the division of the profits, and in consenting to the arrangements made by that contract it may be fairly assumed to have assented to such provisions. The right to assign a share or interest in the profits was one of the terms of the copartnership, which the State accepted as contractor in the place of Schnell. In thus accepting the firm as contractor, with notice that its members had provided for their "assigns" to share in the profits of the building contract, the State itself could not thereafter have objected to Schnell's assignment of his interest, wholly or partially, in the profits that the firm might make out of the contract, whether such assignment was made before the completion of the work, or after.

Suppose the firm of Taylor, Babcock & Company, having the same copartnership articles and agreements as to how the members should share in the profits of the business, had been the original, instead of the substituted, contractors? Could or would it be held that the contract with the State, or the twenty-sixth clause thereof, would operate or have the effect to prevent any member of the firm from assigning a part of his interest in the profits that might be realized in completing the state building? Such a proposition as this could not be maintained. It would be too clear for argument that the state contract with the partnership could not control the

articles of copartnership as between the partners and third parties in respect to what might be realized by the firm out of the contract with the State. Each partner of a firm has an undoubted right to make a valid assignment, either absolutely or as security, in the profits of a partnership. No partner owns absolutely any part of the partnership property. He cannot assign any particular part of such property, or any specific amount of the profits of the concern. But the assignment of his share, or any part thereof, in such profits will pass such part of the profits as may remain after payment of the firm's debts, and settlement of the partnership accounts. The right conferred by the assignment is an intangible thing and can only be reduced to possession by a demand for account, and no notice of such an assignment need be given other than a demand for an account of such profits. This is the rule laid down in *Wallace's Appeal,* 104 Penn. St. 559, where it was held "that a purchaser of a partner's interest, whether at private or judicial sale, acquires merely the right to demand an account from the other partners and receive a certain share of the balance remaining after the payment of the partners' debts and the adjustment of the partnership equities. This right is an intangible thing, and can only be reduced to possession by a demand for an account." In that case it was further held that the assignee of a partners' interest was superior to the claim of general creditors, and all others claiming under the partnership, except the purchasers for value without notice.

The right of the partners, under the articles of copartnership, as well as under the general law, to make a transfer or assignment of their interest in the profits of the firm, should not be confounded with the right of the firm to make an assignment of the contract, so far as the State is concerned. In accepting the copartnership as its contractor the State did not undertake to control the ordinary rights of partners, nor abrogate their private agreement. The opinion of the court asserts the proposition and ·reaches the conclusion that, notwithstanding the terms of the partnership agreement, which provided that the "assigns" of any member of the firm should

be included amongst those who were to share in the profits of the enterprise, as their interest might appear, still such an assignee could acquire no right or title to the profits as against the firm, or members thereof, into whose hands such profits might come, without the consent of the State to such assignment; and as the result of this startling proposition, holds that the appellee, Taylor, who was a member of the firm and a party to that agreement, is relieved from liability to account for profits which belong to the appellant, as the assignee of Schnell. I know of no principle or authority upon which this can be sustained.

Having retained a one-fourth interest in the profits of the building contract, Schnell, on January 31, 1882, by written contract, after reciting the contracts with the State, and with Taylor, Babcock, and the Farwells, transferred and assigned to A. A. Burck and two others, separately and severally, an undivided one-fourth part "of all and whatever share, interest, or advantage, whether in money, lands, or otherwise, which he (said Schnell) may be entitled to have or receive under or by virtue of the contracts herein mentioned and referred to," excepting only the $5000 to be paid for his services as superintendent, and $13,000 coming to him out of the first $50,000 proceeds of land sales. This assignment contained the provision "that this contract shall be binding upon and inure to the executors, administrators, heirs, and assigns of the several parties hereto respectively, and that the same shall be recognized by the parties and trustee named in the contracts herein referred to."

This assignment to A. A. Burck was witnessed by A. C. Babcock, of the firm of Taylor, Babcock & Company, and trustee of the parties to receive and sell the lands to be acquired under the building contract. He not only witnessed the contract, but appeared before the proper officers and proved its execution for registration. The firm of Taylor, Babcock & Company thus had notice through one member thereof of the assignment. In addition to this it is distinctly alleged in the amended bill that this transfer was executed by Schnell "with the knowledge and assent of said partner-

ship," meaning Taylor, Babcock & Company. It is further alleged "that the said Matthias Schnell, having assigned to the said A. A. Burck a right to one-sixteenth interest in the profits that might arise from the construction of said capitol under said contract with the State of Texas, and having made such assignment to said Burck at the time said partnership was existing, as hereinbefore alleged, with the knowledge and assent of said firm as it then existed, the right of the said A. A. Burck to have one-sixteenth of the profits that might arise from the carrying out of said contract and to have an accounting therefor became binding upon said firm and its assignees."

On May 9, 1882, Schnell by written contract transferred his remaining interest in the contracts (consisting of his claim of $13,000, and an undivided one-sixteenth interest or share in the profits that might be realized) to Charles B. and John V. Farwell, Abner Taylor, and A. C. Babcock, "who composed the firm of Taylor, Babcock & Company." In respect to this assignment, which the State approved, the original petition charges "that the said Taylor, Babcock & Company received said assignment from Matthias Schnell of all his interest in said contract to complete said state capitol with full notice of the interest of said A. A. Burck, as hereinbefore alleged, an undivided one-half of which interest A. A. Burck subsequently transferred to plaintiff, S. B. Burck, as aforesaid, and that the said Abner Taylor had full notice of the interest of the said A. A. Burck at the time of the said transfer of Taylor, Babcock & Company to him, the said Abner Taylor, and with full notice that by the terms of the agreement and assignment executed by and between said Matthias Schnell, of the first part, and J. M. Beardsley, James S. Drake, and A. A. Burck, of the second part, that the same should be binding on, and inure to, the executors, administrators, heirs, or assigns of the several parties to the said contract."

Now, after this transfer by Schnell of his interest to the firm of Taylor, Babcock & Company, what was the situation in respect to the profits that might be realized from the building contract? It was clearly this: Taylor, Babcock & Company

thereafter held and owned the three-fourths interest acquired under the partnership contract of January 31, 1882, and one-sixteenth interest derived from the assignment of May 9, 1882, aggregating thirteen-sixteenths interest in the profits, leaving the outstanding three-sixteenths assigned to A. A. Burck and others by Schnell on January 31, 1882. The stipulations of the partnership contract were in no way changed or affected by Schnell's assignment of his remaining interest to the firm of Taylor, Babcock & Company. The obligation of Taylor and his associates, Babcock and the Farwells, to furnish the money required to complete the contract was not altered or abrogated in any way, and if the contract had been completed by Taylor, Babcock & Company, the profits realized from the sales of the lands, after refunding the expenditures made in completing the contract, would have been distributable between the parties in the proportion of thirteen-sixteenths to Taylor, Babcock & Company, one-sixteenth to A. A. Burck, and two-sixteenths to the other two assignees of Schnell.

On June 20, 1882, the firm of Taylor, Babcock & Company transferred the building contract to Abner Taylor, which was assented to by the State, and Taylor thereby became the contractor. But in so doing he did not cease to be bound by the terms of the partnership contract under which Schnell retained his one-fourth interest in the profits, and a right to assign it, as he did. In other words, Taylor, in acquiring the shares of the members of the firm of Taylor, Babcock & Company, in no way either terminated or affected the interest of the parties holding the outstanding interests in the profits assigned by Schnell to A. A. Burck, with the knowledge and consent of both Taylor and the firm of Taylor, Babcock & Company. Nor did the transfer to Taylor by Babcock and the Farwells, as members of the firm of Taylor, Babcock & Company, in any way relieve Taylor from the provisions of the contract of January 31, 1882, which required himself and associates, other than Schnell, to furnish all the money needed to complete the building. The only effect of that transfer was simply to place Taylor in the shoes of Taylor, Babcock & Company, subjecting him to all the obligations resting upon himself and assignors,

and affected by all the rights and equities which were binding upon the firm, not only in respect to the State, but as to all others interested in the result of the enterprise.

It is. held, in the opinion of the court, that this assignment by the members of the firm of Taylor, Babcock & Company to the appellee, Taylor, with the consent of the State, vested in him the absolute and sole interest in the contract, and profits arising therefrom, and that by his completion of the contract he acquired the right to the entire consideration promised by the State, and assumed no liability to either Schnell or to others claiming under Schnell. Schnell's assignee, holding the outstanding one-sixteenth interest in the profits, was no party to that arrangement. His rights were fixed by the partnership articles, and how and upon what principle can it be maintained that Taylor's acquisition of the interest of Babcock and the Farwells in the contract, and the. profits thence to arise, can cut off this outstanding interest held by Burck? By taking the assignment from his copartners, Taylor was in no way released from the obligation to furnish money and complete the contract which rested upon the firm of Taylor, Babcock & Company ; and how is it then that, by acquiring the interest of his copartners, he can terminate or extinguish the right of Schnell's assignee, previously acquired with the knowledge and consent of the firm of Taylor, Babcock & Company ? Can rights acquired with Taylor's knowledge and consent be cut off and extinguished by the private dealings between himself and partners, even though it be with the consent of the State ? No such proposition can be sustained either upon principle or authority.

By the transfer of April 14, 1883, from A. A. Burck to the complainant S. B. Burck, (Exhibit " O,") the latter acquired an undivided one-half interest in the one-sixteenth interest held by the former, and thereby became entitled to one-thirty-secondth part of the profits that might arise upon the completion of the contract, and the sales of the land to be received therefor. This transfer left A. A. Burck the holder of one-thirty-secondth interest in the profits, and, thereafter, on May 27, 1884, he assigned to Abner Taylor and A. C.

Babcock all his right, interest, and claim in and to the contract with the State of Texas derived from Schnell, or any interest he might have in the erection of the capitol building.

These two assignments by A. A. Burck are not, upon their faces, in conflict. They may well stand together. That to S. B. Burck was of a specific interest; that to Taylor and Babcock may be fairly construed to cover A. A. Burck's remaining interest of one-thirty-secondth share of the profits. This last transfer does not purport to convey the one-thirty-secondth interest previously transferred to S. B. Burck, and there is no allegation in the bill to give color to the idea that Taylor and Babcock, in taking the assignment of May 27, 1884, from A. A. Burck, supposed that they were getting a one-sixteenth interest instead of a one-thirty-secondth interest. When that assignment was made to them, Taylor and Babcock both knew that A. A. Burck had acquired from Schnell a one-sixteenth interest in the profits, and it is somewhat significant that they accepted an assignment from him, general in its character, without specification as to the interest conveyed. It is alleged that this transfer from A. A. Burck to Taylor and Babcock did not, upon its face, purport to convey the interest previously conveyed to S. B. Burck. Upon demurrer this statement of the bill with respect to the purport of that transfer must be taken as true. In Campbell v. Mackay, 1 Myl. & Cr. 603, Lord Chancellor Cottenham laid down the rule "that the court upon demurrer must assume the statement of the bill, with respect to the purport of a deed, to be true, and the demurring party is not at liberty to read the instrument itself for the purpose of disproving the statement, notwithstanding that for greater certainty as to its contents, the bill expressly refers to it as being in the demurring party's possession."

When this assignment of May 27, 1884, was made to Taylor and Babcock, the latter had ceased to be a cocontractor for the erection of the building.

The State never assented to either of these assignments by A. A. Burck. The want of that assent is held to violate the transfer to S. B. Burck, while it does not affect that made to

Taylor and Babcock. In reference to these A. A. Burck assignments the bill charges " that for reason why your orator should not have an account or relief against him the defendant pretends that he had no notice that the said A. A. Burck assigned or transferred to your orator a one-half interest in his, the said A. A. Burck's one-sixteenth interest in the profits that might arise from the building of said capitol contract, and that the defendant in good faith and without notice purchased from said A. A. Burck for valuable consideration the said Burck's one-sixteenth in said profits after the said A. A. Burck had sold one-half of his said interest to your orator, and therefore refuses to account with plaintiff; whereas the truth is that the said transfer by A. A. Burck to your orator, which has been hereinbefore stated and made a part of this bill as an exhibit, was duly authenticated for registration in the office of the county clerk, and was duly recorded in the records of deeds of Travis County, Texas, on the 14th day of April, A.D. 1883, and said Abner Taylor then had notice of the same; whereas the said A. A. Burck did not sell or transfer any of his said interest in said profits to said Abner Taylor until the 27th day of May, 1884."

Suppose, as suggested in the opinion of the court, that this does not amount to anything more than an averment of constructive notice arising from the registration of the transfer? It was certainly not an admission that Taylor had no notice of that assignment. But considering the subject-matter of the interest transferred by Schnell to A. A. Burck, and by him to S. B. Burck, and the situation of the parties, the question arises whether want of a definite allegation that Taylor and Babcock had notice of the complainant's interest when they took their assignment from A. A. Burck, can in any way affect or defeat the complainant's rights according to the allegations of the bill?

The interest involved was to arise out of the sales of lands then being, and thereafter to be acquired, without expense to Schnell or his assignees. To whom was an assignee of an interest in the profits under duty and obligation to give notice? The ordinary rule applicable to the transfer of debts or choses

in action has no application to the case, as shown in *Wallace's Appeal*, 104 Penn. St. 603. The principle which would govern and control the question and the conflicting rights of complainant and Taylor and Babcock, if there is any real conflict between them, is the equitable doctrine of a *bona fide* purchaser for value without notice. This is a matter of defence on the part of such purchaser. There is certainly nothing on the face of either the bill or the contracts, made exhibits thereto, to indicate that Taylor, or Taylor and Babcock, have or can assert any such defence, and yet the court's opinion and conclusion gives Taylor the full benefit of that position as effectually as though he had set it up by answer and established it by proof.

There is a clear distinction between choses in action and chattel or freehold interests. This distinction is pointed out in *Wiltshire* v. *Rabbits*, 14 Sim. 76, 77, in which it was held that the person who took the first assignment of an annuity charged on leaseholds was entitled to priority over the person who took the second, notwithstanding the latter may have been beforehand with the former in giving the trustee notice of his security. The same general principle is asserted in *McCreight* v. *Foster*, 5 Ch. App. 604, 610. And in *Wilmot* v. *Pike*, 5 Hare, 14, it was distinctly held that the doctrine of notice applicable in determining the priority of charges on choses in action does not prevail as to equitable estates in land. In that case several mortgages were held to take effect with regard to interests arising out of real estate, according to the order of time at which they were respectively created, and that their priorities were not affected by the giving or failing to give notice to the party in whom the legal estate was vested.

But even treating the interest here involved as an ordinary chose in action, no proposition is better settled than that an assignee of such a right can take only such interest as his assignor has to transfer, and will be bound by all equities binding on the latter, unless it affirmatively appears that the subsequent assignee took without notice. *Davies* v. *Austen*, 1 Ves. Jr. 247; *Brashear* v. *West*, 7 Pet. 608; *Livingston* v. *Hubbs*, 2 Johns. Ch. 312; *McKinnie* v. *Rutherford*, 1 Dev. &

Bat. (Eq.) 14; *Webster* v. *Wise*, 1 Paige, 319; *Gay* v. *Gay*, 10 Paige, 369.

There is no allegation in the bill which can be tortured into an admission that Taylor occupies the position of a *bona fide* purchaser, for value without notice, of the interest of A. A. Burck previously conveyed to S. B. Burck. The opinion of the court goes far beyond giving Taylor the benefit of such position. It, in principle and effect, gives to the covenant against transferring the state contract a greater effect than a law or a statute could have had. How can the rule laid down by the court that the covenant against transferring the state contract has the effect to defeat the rights of an assignee from a member of the firm of contractors be reconciled with the principle announced in *Blair* v. *Gibbes*, 17 How. 232, 239; *Brooks* v. *Martin*, 2 Wall. 70, 87; *Railroad Co.* v. *Durant*, 95 U. S. 576, and also in *Sharp* v. *Taylor*, 2 Phillips, 801, 818? In these cases it was held that there was a distinction between enforcing an illegal or prohibited contract, and the assertion of a title to funds that had been realized out of such transactions. Here the contract with the State has been completed. The State is not objecting to the assignment made by Schnell to A. A. Burck, and by A. A. Burck to S. B. Burck, and certainly Taylor, who not only had knowledge of Schnell's assignment to A. A. Burck, but is charged with having assented thereto, is not in a position to interpose an objection which even the State could not urge in order to withhold funds that do not belong to him. What Lord Chancellor Cottenham said in *Sharp* v. *Taylor*, *supra*, is directly in point here: " As between these two, can this supposed evasion of the law be set up as a defence by one against the otherwise clear title of the other? In this particular suit can the one tenant in common dispute the title common to both? Can one of two partners possess himself of the property of the firm, and be permitted to retain it, if he can show that, in realizing it, some provision in some act of Parliament has been violated or neglected? Can one of two partners in any import trade defeat the other by showing that there was some irregularity in passing the goods through the custom-house? The answer

to this, as to the former case, will be that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do, as between the parties.  Do the authorities negative this view of the case?  The difference between enforcing illegal contracts and asserting title to money which has arisen from them is distinctly taken in *Tenant* v. *Elliot*, 1 Bos. & Pull. 3 ; and *Farmer* v. *Russell*, 1 Bos. & Pull. 296, and recognized and approved by Sir William Grant in *Thomson* v. *Thomson*, 7 Ves. 473."

The same principle is laid down in the recent case of *Kingsbury* v. *Burrill et al.*, 151 Mass. 199, where it was held that an assignment of a fractional part of a claim is good in equity where the person who is to pay raises no objection, following *James* v. *Newton*, 142 Mass. 366.

The present case cannot be distinguished in principle from the rule announced in *Hobbs* v. *McLean*, 117 U. S. 567, in which A, having contracted with the United States to furnish supplies of wood and hay to troops in Montana, entered into partnership with B and C for the purpose of executing the contract.  A was to furnish half the capital, B and C one-fourth each, and profits and losses were to be divided on that basis; but, in fact, the capital was furnished by B and C.  A delivered the wood according to the contract, but failed to deliver the hay, and, payment being refused, he brought suit in his own name in the Court of Claims against the United States to recover the contract price of the wood.  In this suit B and C each was a witness on behalf of A, and each testified that he had no " interest, direct or indirect, in the claim," except as a creditor of A, holding his note.  Pending the suit, A became bankrupt, and then died.  His administratrix was admitted to prosecute the suit, but before entry of final judgment his assignee in bankruptcy was substituted in her place.  Final judgment was then rendered in favor of the assignee, and the amount of the judgment was paid him.  B and C, as surviving partners, then filed a bill in equity against the assignee and the attorneys and counsel, to recover their shares in the partnership property, and the court sustained their right to recover.

The attempt to draw distinctions between decisions which involve no substantial differences in principle is not only unwise, but is attended inevitably with embarrassment in the administration of the law. The cases of *Arkansas Valley Smelting Co.* v. *Belden Mining Co.*, 127 U. S. 379, and *Delaware County* v. *Diebold Safe and Lock Co.*, 133 U. S. 488, cited in the opinion of the court, fall far short of asserting the proposition that a member of the firm of Taylor, Babcock & Company (the substituted contractors with the State) could not transfer an interest in the profits to arise out of the building contract without the consent of the State. There is a class of cases where the services to be rendered are of such a personal character that they cannot be assigned; but where is the authority that holds that where a firm is a contractor to do certain work a member of such firm cannot assign or transfer his share of the profits to arise therefrom? I have looked in vain for such an authority.

The real question before the court upon the bill, and the demurrer thereto, is not whether Schnell could have assigned to A. A. Burck the right to take part in or assert any control over the construction of the state capitol, or to have recovered from the State the compensation it had promised to pay therefor? But the question is, can Taylor retain a share of the profits which belong to Schnell by the partnership agreement, made with himself and his associates upon full consideration, a portion of which profits Schnell, "with his knowledge and consent," transferred to A. A. Burck, who assigned a part thereof to the complainant? Under and by what provision of the contract, described in the record, did Taylor become entitled to hold that share for his own benefit?

The bill shows that the building cost about $3,700,000; that the lands received from the State as compensation for the work, and since sold, were worth from ten to eleven millions of dollars, and the profits made on the transaction were between seven and eight millions of dollars. By the terms of the partnership contract, all the expenditures connected with the completion of the building were to be refunded with interest, and the remaining profits were to be divided " as the interest of the

parties or their assigns might appear." The complainant as an "assign" holds title to one-thirty-secondth interest of those profits. The bill clearly discloses his right thereto, and I fail to see upon what principle Taylor can dispute his claim or deny the account which he seeks. To allow him to do so, under the allegations in this bill, and upon the ground on which it is rested, that the State did not assent to the complainant's acquisition of the interest he holds, is not only a perversion of right and justice, but finds no sanction or support in either principle or authority.

MR. JUSTICE SHIRAS concurs in this dissent.

MR. JUSTICE WHITE was not a member of the court when this case was argued, and took no part in its decision.